IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,  ) | CR 09-01423-TUC-JMR(HCE) |
| Plaintiff,  ) | **REPORT AND RECOMMENDATION** |
| vs.  ) | |
| Dionicio Reyes-Perez,  ) | |
| Defendant.  ) | |

Defendant filed a Motion to Suppress Statements (Doc. No 32). The Government filed a Response to Defendant's Motion to Suppress (Doc. No. 45). Defendant filed a Reply to the Government's Response to Motion to Suppress Statements (Doc. No.55).

Defendant's motion came on for hearing on May 26, 2010. Border Patrol Agent Helaman Lambson (hereinafter "BPA Lambson") testified (hereinafter "Lambson at p. _") on behalf of the Government. Defendant testified (hereinafter "Reyes-Perez at p. _") on his own behalf. A transcript of the May 26, 2010 hearing was ordered by the Magistrate Judge, filed on June 3, 2010 (Doc. No. 68), and is forwarded to the District Court for review.

Six exhibits were admitted into evidence: (1) Government Exhibit 1: a map of Nogales, Arizona; (2) Government Exhibit 2: Photo of warehouse "W9" in the King Louis area of Nogales, Arizona; (3) Government Exhibit 3: Photo of outside of warehouse "W9"; (4) Government Exhibit 4: Photo of alley next to warehouse "W9"; (5) Government Exhibit

5: Photo of wall in alley next to warehouse "W9"; (6) Government Exhibit 6: Photo of roof of warehouse "W9". These exhibits are forwarded to the District Court for review.

## I. INDICTMENT

Defendant is charged with being an alien who entered and was found at or near Nogales, Arizona, in the District of Arizona on June 20, 2009, after having been denied admission, excluded, deported, and removed from the United States of America at Laredo, Texas on July 9, 2008 and he did not obtain the express consent of the Attorney General or the Secretary of the Department of Homeland Security to reapply for admission to the United states of America, in violation of 8 U.S.C. §1326, enhanced by 8 U.S.C. §1326(b)(2).

## II. FACTUAL BACKGROUND

BPA Lambson has worked as a Border Patrol agent in Nogales, Arizona for approximately 3½ years. (Lambson at p. 14). He reads, writes and speaks fluently in Spanish and is certified to teach Spanish to new Border Patrol agents. (*Id.* at pp.14-15). BPA Lambson was assigned to work an area of Nogales, Arizona, referred to as King Louis. (*Id.* at p. 18). The King Louis area is located at Mariposa Avenue and Freeport Drive in Nogales, Arizona. (*Id.* at p. 16). The King Louis area consists of a series of warehouses located approximately 100 to 150 yards north of the United States-Mexico border.[1] (*Id.* at pp. 16-17). BPA Lambson has been told and shown by other more experienced Border Patrol agents of common hiding places used by suspected undocumented aliens, including a warehouse labeled "W9". (*Id.* at p. 18). Moreover, BPA Lambson has been told by the owners of warehouse W9 of the damage caused to the roof because of the weight of undocumented aliens utilizing the roof. (*Id.* at p. 49). On June 20, 2009, a Saturday, at approximately 7:00 a.m., BPA Lambson went to warehouse W9 to check on its roof for undocumented aliens. (*Id.* at p. 48).

---

[1] On Government Exhibit 1, the King Louis area is denoted with the letter "A".

BPA Lambson parked his patrol vehicle on the westside of W9[2] near an alleyway[3] that runs alongside this warehouse. He walked down the alleyway to a wall[4] that he climbed in order to peek onto the roof of warehouse W9. The distance from the top of the wall to the edge of the roof is 7 feet. (*Id.* at p. 47). BPA Lambson is 6 feet tall and had to pull himself up to the edge of the roof such that he hung from the edge of the roof. (*Id.* at pp. 21, 47). Peering onto the roof, BPA Lambson espied seven individuals laying down. (Lambson at pp. 21-22; *see also* Reyes-Perez at p. 51). The individuals were not sleeping. (Lambson at p. 22; Reyes-Perez at p. 52). The individuals were not visible from the street. (*Id.* at p. 48). The reason the individuals were laying down was so that they could not be seen by anyone. (Reyes-Perez at p. 52). Among the individuals was Defendant. (Lambson at p. 23).

BPA Lambson testified that he told the individuals to stop, remain laying down, and that he was a Border Patrol agent. (Lambson at pp. 22, 36). He thought the individuals might be in the United States illegally. (*Id.* at p. 23). He testified that he did not tell the individuals that they were in custody and were not free to leave[5]; nor did he handcuff them or un-holster his firearm. (*Id.* at p. 23). BPA Lambson did not tell the individuals that they were under arrest. (Reyes-Perez at p. 55). He did, however, ask them questions collectively in Spanish and made sure that each one responded to his questions. (Lambson at p. 24). He asked the individuals of what country they were citizens and they, including Defendant, responded "Mexico". (*Id.* at pp. 24-25). He asked the individuals if they had documentation to show that

---

[2]*See* Government Exhibit 3. (Lambson at pp. 19-20).

[3]*See* Government Exhibit 4. (Lambson at p. 21).

[4]*See* Government Exhibit 5. (Lambson at p. 21).

[5]Defendant, who was assisted by a court interpreter at the suppression hearing, understands English and speaks some, but not proficiently enough to testify in English. (Reyes-Perez at p. 51). Defendant testified that BPA Lambson told the individuals not to run because they were surrounded. (*Id.* at p. 52). Defendant felt that he could have tried to escape and leave but did not because BPA Lambson had ordered the individuals to stay and had said that they were surrounded. (*Id.* at p. 53).

they were in the United States legally and they, including Defendant, responded that they did not. (*Id.* at p. 25).

BPA Lambson radioed for other agents to come and assist him in taking the individuals down from the roof. (*Id.*). Once on the ground ten to fifteen minutes later, Defendant was individually asked questions by BPA Lambson. (*Id.* at pp. 26-27). Specifically, he was asked and he answered in pertinent part, his name: Dionicio Reyes-Perez; where was he born: Tuxpan, Nayarit, Mexico; when had he entered the United States: earlier that morning; whether he had permission to be in the United States: no he did not have permission; and if he knew it was illegal to enter in the manner that he had used: he knew it was illegal. (*Id.* at pp. 27-29). Defendant was not threatened, coerced, or promised anything in exchange for answering BPA Lambson's questions. (*Id.* at p. 29). BPA Lambson considered Defendant to be in custody at this time. (*Id.* at p. 42). He did not, however, advise Defendant of his *Miranda* rights prior to asking him the aforesaid questions. (*Id.* at p. 43).

Because of the large number of illegal entrants in the area, Border Patrol agents, including BPA Lambson, do not advise arrestees of their *Miranda* rights until they are later at the Border Patrol station. (*Id.*). Defendant was not advised of his Miranda rights until approximately 6:00 p.m. at which time he stated he was a citizen of Mexico, born on December 2, 1962 in Nayarit, Mexico; that he entered the United States illegally the morning of June 20, 2009 near Nogales, Arizona; that he had been previously removed from the United States and had not applied for permission to re-enter. (Government's Response to Defense Motion to Suppress at pp. 2-3).

## III. DISCUSSION

### A. Statements Not To Be Used By The Government At Trial

The Government has avowed not to introduce in its case-in-chief, *non-Mirandized a* statements made by Defendant to BPA Lambson once off the roof and on the ground. (May 26, 2010 Hearing at pp. 62). It will introduce such statements for impeachment and rebuttal should Defendant testify and deny making such statements. (*Id.* at p. 63).

The Government has avowed not to introduce in its case-in-chief, nor for

impeachment or rebuttal, *post-Miranda* statements made by Defendant 11 hours after he was first encountered by BPA Lambson. (*Id.*); *See* 18 U.S.C. §3501(c).

### B. Statements Sought To Be Used By The Government

The only statements at issue are Defendant's answers to questions collectively asked by BPA Lambson of Defendant and the other individuals on the roof of warehouse W9.

#### 1. Law

It is well-established that investigatory stops by law enforcement, however brief, are governed by the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968). Investigatory stops are lawful provided that they are based on reasonable, articulable suspicion that a person is engaged in criminal activity. *United States v. Arvizu*, 534 U.S. 266, 273 (2002)("[T]he Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'"); *United States v. Orman*, 486 F.3d 1170, 1171-72, 1176-77 (9th Cir. 2007)(investigatory stop valid because officer had reasonable suspicion defendant was carrying a gun).

In determining whether reasonable, articulable suspicion exists at the time of the investigatory stop, a "totality of the circumstances" test is applied. *Arvizu*, 534 U.S. at 275-77; *United States v. Cortez*, 449 U.S. 411, 417 (1981). Reasonable suspicion must objectively exist. *Arvizu*, 534 U.S. at 273. Furthermore, reasonable suspicion is based upon the law enforcement officer's personal observations and knowledge that a crime has been committed. *United States v. Hartz*, 458 F.3d 1011, 1017-18 (9th Cir. 2006) (reasonable suspicion to stop based upon police observation of vehicle with seemingly new license plates attached by "zip-ties" and such vehicle matched description of recently stolen vehicle); *United States v. Summers*, 268 F.3d 683, 687 (9th Cir. 2001)(reasonable suspicion to detain individual who gave questionable explanation during consensual questioning near charity collection station late at night). Courts give considerable deference to a law enforcement officer, basing such reasoning on that officer's experience in discerning criminal conduct not readily evident to a lay person. *Arvizu*, 534 U.S. at 277.

The range of law-enforcement permitted activity during an investigatory stop must be

- 5 -

reasonably related in scope to the circumstances giving rise to the stop in the first instance. *United States v. Sharpe*, 470 U.S. 675, 682 (1985). If reasonable suspicion exists, law enforcement may detain a person to ascertain his or her identity. *United States v. Christian*, 356 F.3d 1103, 1106 (9th Cir. 2004)(reasonable to request suspect's identification when law enforcement had reasonable suspicion that subject of complaint involving weapon was still in apartment complex and officers had been given name from complainant). When law enforcement detains a suspect beyond the amount of time that is necessary to effectuate the purpose of the stop, the seizure transforms into an arrest and must be supported by probable cause. *United States v. Brignoni-Ponce*, 422 U.S. 873, 880-81 (1975). The Supreme Court has declined to establish a "bright line" rule in determining when an investigatory stop becomes an arrest. *United States v. Sharpe*, 470 U.S. at 685 ("Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.").

### 2. **Analysis**

BPA Lambson had been informed and shown by more experienced Border Patrol agents, common hiding places used by undocumented aliens, including the roof of warehouse W9. He had also been informed by the owners of warehouse W9 that the weight of individuals on their roof was causing damage to the roof. Warehouse W9 is 100 to 150 yards from the United States-Mexico border. On Saturday, June 20, 2009 at 7:00 a.m., BPA Lambson could not see from the ground whether anyone was on the roof of warehouse W9. He climbed on a wall next to warehouse W9, pulled himself up to the edge of the roof, and peered over to see whether anyone was there. He observed seven individuals on the roof laying down, but they were not sleeping. He told them in Spanish to remain laying down and that he was a Border Patrol agent. BPA Lambson suspected the individuals might be undocumented aliens.

BPA Lambson climbed onto the roof. He did not un-holster his firearm, did not handcuff anyone, did not tell them that they were under arrest or in custody, and did not tell them they were not free to leave. Instead, he asked them collectively of which country they

were from and if they had documentation showing they had permission to be in the United States. They, including Defendant, collectively answered that they were from Mexico and did not have documentation. Ten to fifteen minutes later, with assistance from other Border Patrol agents taking the individuals down from the roof, Defendant and the other individuals were in custody and under arrest.

The totality of the circumstances establishes an objective and particularized suspicion that Defendant and the other individuals were engaged in wrongdoing. In BPA Lambson's experience, seven individuals, not otherwise observable from the street, laying down on the roof of a warehouse known to be used by undocumented aliens and located 100 to 150 yards from the United States-Mexico border, at 7:00 a.m. gives rise to a reasonable suspicion that crime is afoot. *See United States v. Berber-Tinoco*, 510 F.3d 1083, 1088 (9th Cir. 2007), *cert. denied* __U.S__, 129 S.Ct. 105 (2008), (reasonable suspicion in part because law enforcement knew someone had illegally crossed border when seismic activation device was activated). Law enforcement observations and conclusions are accorded great deference. *United States v. Mayo*, 394 F.3d 1271, 1275 (9th Cir. 2005). The investigatory stop herein was reasonably related to the circumstances that initially justified it: a Border Patrol agent coming upon seven individuals laying down on the roof of a warehouse located a short distance from the United States-Mexico border and brief inquiry to ascertain from the seven individuals on the roof where they were from and, given their answer of "Mexico", if they were documented to be in the United States. *United States v. Turvin*, 517 F.3d 1097, 1101-02 (9th Cir. 2008)(reasonable to pause ticket-writing process to ask questions unrelated to traffic stop because questioning did not cause unreasonable delay and police had information linking driver to rolling drug lab); *United States v. Galindo-Gallegos*, 244 F.3d 728, 732 (9th Cir. 2001), *amended* 255 F.3d 1154 (9th Cir. 2001)("Where officers apprehend a substantial number of suspects and question them in the open prior to arrest, this is ordinarily a *Terry* stop, not custodial questioning, ....").

## IV. CONCLUSION

Defendant and the other six individuals were not in custody and under arrest when confronted by BPA Lambson on the roof of warehouse W9. Any questions asked of and answers given by Defendant and the others were not the result of custodial interrogation. The investigatory stop was brief and the scope of questioning was reasonably necessary to effectuate the purpose of the stop. Consequently, BPA Lambson was not required to advise Defendant, or the other individuals, of their *Miranda* rights.

## V. RECOMMENDATION

The Magistrate Judge recommends that the District Court:

(1) DENY IN PART Defendant's Motion to Suppress Statements (Doc. No. 32) to the extent that answers given by Defendant to questions initially asked on the roof top were pursuant to an investigatory *Terry* stop;

(2) In light of the Government's avowals at the suppression hearing, GRANT IN PART Defendant's Motion to Suppress Statements (Doc. No. 32) to the extent that:

    (a) *pre-Miranda* statements made on the ground ten to fifteen minutes after the investigatory *Terry* stop will only be introduced for impeachment of Defendant should he testify at trial;

    (b) *post-Miranda* statements made eleven hours after Defendant was initially detained will not be introduced in the Government's case-in-chief nor for impeachment of Defendant should he testify at trial.

Pursuant to 28 U.S.C. §636(b) and Rule 59 of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of the Report and Recommendation. If objections are filed, the parties should use the following case number: **CR 09-01423-TUC-JMR**.

Failure to file objections in accordance with Fed.R.Cr.P. 59 will result in waiver of the right to review.

DATED this 17th day of June, 2010.

_Héctor C. Estrada_
Héctor C. Estrada
United States Magistrate Judge